2020 IL App (1st) 191032-U

No. 1-19-1032

Order filed September 3, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| ANDRZEJ KOLODZIEJ, as Independent Administrator of the Estate of Michal Duda, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 L 7775 |
| JUSTICE PARK DISTRICT, VILLAGE OF JUSTICE, BRIDGEVIEW PARK DISTRICT, and VILLAGE OF BRIDGEVIEW, | ) ) ) ) | |
| Defendants, | ) ) | Honorable Marguerite Anne Quinn, |
| (Justice Park District, Defendant-Appellant). | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where a jury rendered a verdict in favor of the plaintiff in a wrongful death and survival action based on the drowning of a child in a park district swimming pool, the defendant was not entitled to a judgment notwithstanding the verdict, the trial court's evidentiary rulings and jury instructions were not an abuse of discretion, and the verdict was not excessive.

¶ 2      A jury awarded a $21.5 million verdict in favor of plaintiff, who had brought this wrongful death and survival action based on the drowning of 6-year-old Michal Duda at a swimming pool operated by defendant Bridgeview Park District (Bridgeview) while Michal was attending a summer day camp operated by defendant Justice Park District (Justice). During jury deliberations, plaintiff agreed to accept a $3 million settlement from Bridgeview, resulting in an $18.5 million judgment against Justice.

¶ 3      On appeal, Justice argues that it was entitled to a judgment notwithstanding the verdict (judgment n.o.v.) because its conduct was not willful and wanton as a matter of law since the undisputed evidence showed that it took numerous precautions to avoid the risk of injury.

¶ 4      Justice also argues the trial court abused its discretion by making evidentiary rulings that (1) limited Justice's ability to present evidence that would have shown its conduct was negligent rather than willful and wanton, (2) allowed evidence of Justice's alleged violation of its internal rules to show it had breached its legal duty, (3) imposed the statutory duties of a swimming pool operator on Justice, and (4) allowed expert testimony of Michal's conscious pain and suffering without a factual basis.

¶ 5      Furthermore, Justice argues the trial court abused its discretion by (1) rejecting Justice's jury instructions and a special interrogatory regarding negligence, (2) preventing Justice from arguing to the jury the distinction between negligence and willful and wanton misconduct, and (3) striking Justice's offer of proof regarding its expert's criticisms of the testimony of plaintiff's expert.

¶ 6      Finally, Justice argues that the excessive verdict requires a remittitur or a new trial.

¶ 7     For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 8                               I. BACKGROUND

¶ 9     During the summer of 2014, 6-year-old Michal Duda attended a day camp held by Justice. On June 17, 2014, Michal was one of the many campers Justice took to a group swim at a public pool operated by Bridgeview. At 1:42 p.m. that day, Michal was discovered floating in the shallow end of the pool without any flotation device on his body. His face was under water and he was nonresponsive. Once Michal was removed from the pool, CPR efforts began, and he was taken by ambulance to a hospital. Physicians were able to regain a stabilized heart rate after 78 minutes of cardiac arrest. However, during the cardiac arrest, Michal's brain suffered irreversible damage from a lack of adequate oxygen. As a result, life support was removed, and Michal died on June 18, 2014.

¶ 10    A suit for wrongful death and survival damages was filed by Andrzej Kolodziej, as Independent Administrator of the Estate of Michal Duda, deceased, alleging the defendants were liable for willful and wanton misconduct.

¶ 11    At the jury trial, the evidence showed that, Justice's summer camp had a total of 10 counselors, mostly of high school age, for the children. Justice held an orientation for its counselors prior to the start of camp to prepare them for their summer jobs and train them in CPR, first aid and the use of AED devices. The counselors also reviewed Justice's summer camp employee manual, which provided that Justice would take the campers to the Bridgeview pool once a week.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 12    Justice also prepared a parent manual and held a summer orientation program for campers and their families. The parent manual indicated that flotation devices were allowed at the Bridgeview pool. In addition, Justice summer camp director Kelly Williams prepared weekly notices for campers and their families, which explained that the campers would be visiting the Bridgeview pool during camp and, if needed, campers should bring arm floaties or a life jacket from home.

¶ 13    Bridgeview had an "L"-shaped main pool, a "kiddie" wading pool, and three certified lifeguards on duty. Corded buoys separated the main pool's shallow area, known as the lap pool, from the deep area, known as the diving well. The depth of the shallow area sloped from 3 feet and 6 inches at one end to 5 feet at the other end. The shallowest end had a staircase with arm rails. The pool had one lifeguard stand at the far side of the diving well and another stand at the inner "elbow" of the pool deck.

¶ 14    Justice divided its counselors into three supervisory groups based on the campers' ages, *i.e.*, ages 5 to 7, 8 to 9, and 10 to 12. Justice conducted swim tests at the Bridgeview pool for all its campers and brought multiple sets of flotation devices (water wings or "floaties") to pool for its campers to use. Justice required its non-swimmer campers to wear flotation devices once they were inside the fenced area of the pool and to use only the shallow area of the pool.

¶ 15    Bridgeview's posted rules stated that the maximum age allowed in the kiddie pool was 5 years old. The witnesses, however, gave conflicting testimony regarding who was allowed to use the kiddie pool. Williams testified that before the summer of 2014 Justice's campers were allowed to use the kiddie pool if they could not swim or stand in the shallow end of the main pool with their mouth or nose above the water level. According to Williams, Bridgeview officials told her prior to June 17, 2014, that the Justice campers could no longer use the kiddie pool—an assertion

denied by Bridgeview's executive director and its former office manager. The testimony of Bridgeview's lifeguards established that a sign by the kiddie pool stated that its use was limited to children who were 5 years old or younger.

¶ 16    On June 12, 2014, the Justice campers made their first trip of the summer to the Bridgeview pool and Williams ordered swim tests for all the campers.  During his swim test, Michal would not let go of the side of the pool, so Williams concluded that he was a non-swimmer. When the campers returned to the pool on June 17, 2014, Williams retested Michal and again concluded that he could not swim. There were 73 campers enrolled in Justice's camp that week, and about 8 or 10 of them could not swim. The group of 5-7-year-old campers consisted of 27 campers, 4 of whom (including Michal) were non-swimmers. This group had three counselors: Julian Gonzalez, Lauren Paluch, and Danielle Hamzik. Each of these counselors had been advised that Michal was one of the members of their group who could not swim. Williams instructed her counselors to stay close to the non-swimmers but left it up to them to decide who would be in the pool and who would observe from the side of the pool.

¶ 17    Because Michal was a non-swimmer, Williams put water wings on him after they arrived at the pool. Later, however, Williams saw Michal without the water wings and spoke to both him and his counselors about it. She gave Michal a time out, told him that he needed to keep his water wings on, and put the water wings back on him before allowing him back in the pool.

¶ 18     There was a substantial amount of testimony and video evidence about the location of the Justice counselors during the day and particularly after 1 p.m. Gonzales testified that he agreed to be the counselor in the pool, but after 1 p.m., neither he, Paluch nor Hamzik went back in the pool. The video showed that at 1 p.m. Gonzales was sitting to the right of the elbow near the diving well and Paluch was sitting off to his left and nearer to the shallow area of the pool. Hamzik was sitting

in the far corner near the diving well. A little after 1:20 p.m., Gonzales looped around the shallow end of the pool and went over to Hamzik, where he remained for 6 or 7 minutes. Williams joined them. During this period, Paluch took one of the campers to the bathroom. Hamzik and Gonzales then walked back to the shallow end. Gonzales acknowledged seeing Michal at some point that afternoon without his flotation device on.

¶ 19    Paluch's testimony was generally consistent with Gonzales's, except Paluch stated that she had been in the water that morning. She noted that when she took the camper to the bathroom while Hamzik and Gonzales were at the deep end, other Justice counselors were at the shallow end.

¶ 20    Hamzik testified that she recalled seeing Michal at some point in the shallow area by the ladder and wearing floaties. She did not spend any time in the water that day. After lunch, she spent much of her time in the deep end of the pool because it was the most dangerous area and the campers there, including some from her age group, needed help. Furthermore, counselors for the other age groups were watching the shallow area of the pool. The counselors usually were required to stay with their assigned group during camp activities because Justice separated the campers by age to promote safety. At the pool, however, the campers were all intermingled because their swimming abilities varied irrespective of their ages. Consequently, the counselors spread out around the perimeter of the pool and watched all of the campers.

¶ 21    Other Justice camp counselors testified consistently with Hamzik regarding their understanding of their responsibility to look after all campers while at the pool. Joe Shue, who was a counselor for the 10-12-year-old group, focused his attention on the shallow area by the ladder, which was a high traffic area for the children. Shue spent a lot of time by the elbow in the pool because the campers usually congregated in the water there and it was a good vantage point to

view a majority of the shallow area. Shue could also turn around and see the majority of the diving well. And by taking a few steps either way, he could see any blind spot that was blocked by the lifeguard stand. Shue was in and out of the shallow water several times that day.

¶ 22    Tabitha Miller, another counselor for the 10-12-year-old group, testified that she was watching all the campers at the pool. Generally, she either stood in the water along the shallow end or on the deck at the elbow where she could see the entire pool. She testified that Michal got his water wings in the morning and put them on, but she later saw him in the pool without them and observed Williams give him a time out and not allow him back in the pool until he put his water wings back on. Miller twice put the water wings on Michal herself.

¶ 23    Brandon Palmer, another counselor in the 10-12-year-old group, positioned himself so that he could see both the shallow end and the diving end with just a swivel of his head. The video showed him at one minute intervals, either watching the shallow end of the pool or getting in the pool with campers from 1:08 p.m. until 1:35 p.m.

¶ 24    Justice counselor Michael Harvey was assigned to the 8-9-year-old group. He knew Michal because he had been his substitute teacher. At approximately 1:22 p.m., Harvey escorted Michal to the washroom at Michal's request. When they exited the washroom, Michal went toward the shallow end and Harvey went to the deep end to watch his 8 to 9-year-olds in that area. Harvey did not know that Michal could not swim.

¶ 25    At approximately 1:30 p.m., it was time for the Justice campers to leave the pool, with the youngest group exiting first. To gather the members of the 5-7-year-old group, Williams told them to leave the pool and Gonzales clapped his hands. Williams was standing at the shallow end between the pool ladder and the lifeguard chair. She observed Michal, who was holding onto the edge of the pool in the shallow end and was not wearing his water wings. Williams told him to exit

the pool and observed him start to get out of the pool and head toward the fenced area. She expected that Michal would then go to the locker room. Williams observed the other 5-7-year-old campers leave the pool. She never saw Michal go back in the pool and did not know that he reentered the water after she had instructed him to leave the pool and go to the locker room. There was no evidence that any Justice counselor was aware that, after being told to leave the pool, Michal had apparently reentered the water. Gonzales testified that he was trained to do a headcount of his campers before escorting them from the pool deck to the locker rooms, but he did not perform a headcount on this date.

¶ 26    Melanie Holden, a camp counselor for Bridgeview, was alerted by a child in the water that something was wrong with Michal. Michal's body was in a vertical position, but his head was facedown and underwater while the top of his head was above water. Holden tapped Michal on the shoulder and picked him up when he did not respond. Holden then screamed lifeguard Rachel Schwab's name to get her attention. When Holden reached the edge of the pool, she handed Michal to Shue. Michal was not wearing his water wings when he was pulled from the pool at approximately 1:42 p.m.

¶ 27    Bridgeview had three certified lifeguards on duty that day: Rachel Schwab, Natasha Naumovski and Annette Zajac. At the time of the occurrence, Schwab was in the chair watching the shallow end, Naumovski was the roving lifeguard, and Zajac, the head lifeguard, was in the chair watching the diving well.

¶ 28    Schwab testified that, as the lifeguard at the shallow area of the pool, she had the responsibility to scan the water and enforce pool rules to ensure the safety of the patrons. If a child could not swim, that child either needed to have an appropriate flotation device or be under the care of an individual. Although water wings were unreliable, they were allowed at Bridgeview.

Schwab described in detail how she would scan the entire shallow area of the pool. Assuming that Michal was in the water for 9.5 minutes before he was pulled from the pool, Schwab stated that she would have scanned the area where he was 50 times, while he was less than 20 feet away. Yet Schwab never saw him until Holden screamed Schwab's name. Schwab did not remember whether Justice was permitted to use the wading pool, but she did know there was an age limit for its use.

¶ 29    Naumovski was the roving lifeguard. She testified that Bridgeview's pool rules required Michal to be supervised at all times if he could not swim or stand in the shallow end of the pool. However, she did not know whether Justice had ever been informed of the pool rules. She had learned in Red Cross lifeguard training that water wings were more like a toy than a life jacket because water wings would not keep a child from going underwater. Nevertheless, Bridgeview allowed water wings at the pool. The video showed Naumovski standing alongside the lifeguard stand at the shallow end at 1:30 p.m. for 30 seconds and then again from 1:36 p.m. until Michal was pulled from the pool. Naumovski testified that she was scanning the pool this entire time but never observed Michal. According to Naumovski, the wading pool was for ages 5 and under, but she never excluded anyone from using it.

¶ 30    Zajac, who was the head Bridgeview lifeguard, testified regarding the Red Cross lifeguarding manual and the precautions that should be taken when a group comes to a pool. According to the manual, lifeguards should ensure that patrons stay in the sections of a pool appropriate for their swimming ability. Accordingly, pool managers should meet in advance with the leaders of a visiting group to discuss plans and procedures, but Bridgeview did not hold such meetings. The manual also stated that pool managers should give the visiting group's leaders a copy of the pool's rules and expectations of camp counselors, but Zajac did not know if this was ever done. Zajac was not aware of any meeting between the staffs of Bridgeview and Justice.

¶ 31    The manual also required pool management to provide visiting groups with a safety orientation, but Zajac was not aware that Bridgeview conducted any such orientation with Justice. During such a meeting, the pool managers or staff would inform the visiting group that a child who could not swim or stand in the shallow area of the pool should either stay out of the pool or wear a life jacket or flotation device and be closely supervised by an adult. Zajac did not remember the lifeguards ever giving Justice a safety orientation.

¶ 32    Zajac testified that a lifeguard had a duty to enforce the pool's rules and regulations and monitor activities in and near the water through surveillance of the patrons. Zajac did not know of any exceptions to the sign by the wading pool, which said that its use was limited to children 5 years old and younger. Zajac and Schwab initially performed CPR on Michal until Williams took over for Schwab. They continued CPR until paramedics arrived but were unable to revive Michal.

¶ 33    The Bridgeview pool video surveillance cameras provided 20 different views. Plaintiff retained an audio/video forensic expert, David Notowitz, to examine the videos from the date of the occurrence. Notowitz selected three camera views that were presented at trial. Based on deposition testimony and his own evaluation, Notowitz identified various people on the videos by using color coded arrows. The people Notowitz identified on the video exhibit were Michal, Williams, eight Justice camp counselors, Bridgeview roving lifeguard Naumovski, and a 9-year-old Justice camper, who was the brother of Justice counselor Gonzalez.

¶ 34    The video began at 1 p.m. and concluded approximately 50 minutes later after paramedics took Michal from the scene on a stretcher. The quality of the video was poor due to the limitations of the original surveillance videos. Consequently, the identity of people and details of what they were doing were difficult to discern. Notowitz identified two boys jumping into the pool, either at

the 13:33:20:50 or 13:33:30:66 mark of the video, but admitted that it was possible neither boy was Michal.

¶ 35    Julienne Hefter, the executive director of the Association of Aquatic Professionals, testified as plaintiff's aquatics expert. Hefter opined that Justice's conduct  was willful and wanton and showed an utter indifference and a conscious disregard for safety by taking Michal to the Bridgeview pool on June 17 and not putting him in a Coast Guard approved flotation device, not marking him as a non-swimmer, and failing to supervise him. According to Hefter, Justice was willful and wanton for not having counselors in the water with Michal at all times when they knew he could not swim or stand with his head above water. Hefter testified that her opinions were not based on any statutes or administrative regulations applicable to swimming pools, except for the lifeguard requirement, which was met in this case. She acknowledged the evidence did not show that any Justice employee had observed Michal in the water after his group was told to exit and ignored him.

¶ 36    Matthew Henry, the executive director of Skyline Camp and Retreat Center, testified as plaintiff's expert on camping. Skyline was an overnight camp, not a day camp, and Henry had worked only at camps that had swimming pools or lakes. He was an American Red Cross lifeguard instructor and supervised the lifeguards at his camp. He opined that the conduct of various Justice individuals was willful and wanton and demonstrated a conscious disregard and utter indifference for Michal's safety. Henry's opinion was based on the following four factors. First, Justice's executive director failed to communicate with Bridgeview to ensure that its kiddie pool was available; instruct Williams and the camp counselors during training that children who could not swim or stand in the pool with their heads above the water level should not be in the water; have an appropriate headcount system; and have an adequate system to distinguish non-swimmers from

swimmers. Second, Justice's summer camp director Williams failed to adequately supervise the counselors and campers because, even though she knew that Michal could not swim or stand in the pool with his head above the water level and continuously removed his floaties, she failed to keep him out of the water and ensure that the counselors knew their roles with respect to non-swimmers. Henry opined that Williams' conduct was willful and wanton because she allowed Michal in the pool with an inadequate flotation device, did not adequately identify the non-swimming campers to all her staff and Bridgeview's lifeguards by marking the non-swimmers with a wristband or other visual method, did not conduct proper headcounts of the campers, and failed to train the counselors adequately.

¶ 37    Third, the conduct of the three Justice counselors assigned to the 5-7-year-old group was willful and wanton because they spent substantial time away from the shallow area of the pool and allowed Michal to be in the pool without supervision and an adequate flotation device even though they knew he could not swim or stand in the shallow area. Henry opined that at least one of those three counselors should have been in the pool and within reach of Michal at all times. Fourth, if the other Justice counselors had allowed Michal in the pool knowing that he could not swim or stand with his head above the water level, then their conduct was willful and wanton.

¶ 38    Justice presented the expert testimony of Dr. David Smith, who had a PhD in education with an emphasis on psychology and had written his doctoral dissertation on improving aquatic safety. He opined that the evidence of the many affirmative acts Justice took to enhance the campers' safety and minimize their risk of injury at the pool showed that Justice acted with conscious regard for its campers and concern for their safety. Specifically, Dr. Smith noted that Justice (1) prepared and provided its summer camp counselors with an employee manual that set forth their responsibilities, (2) had a comprehensive plan for the counselors' orientation program,

which included CPR, first aid and AED training, (3) prepared a manual for the campers' parents that described camp activities and offered them an orientation program, (4) adequately communicated with the parents about the upcoming swimming pool visits and informed them that campers should bring flotation devices or life jackets on pool days, (5) divided the campers into groups by age and assigned specific counselors to supervise those groups, (6) took the campers to a pool that had certified lifeguards; (7) gave the campers tests to assess their swimming ability and identify the swimmers and non-swimmers, and (8) disciplined Michal when he removed his water wings. Even plaintiff's experts Hefter and Henry acknowledged on cross-examination that these actions showed Justice's conscious regard for its campers and concern for their safety. Dr. Smith testified that although some of Justice's personnel had engaged in conduct that was unreasonable, that conduct was not willful or wanton.

¶ 39    Plaintiff's expert, Dr. David Warner, was an anesthesiologist from Duke University and had dedicated his career to the study of brain injuries. He explained the phases of drowning, which included the struggle phase where a victim realizes danger and suffers. This period is known to last 20 to 60 seconds. He explained that it takes a drowning victim from 2 1/2 to 3 1/2 minutes, conservatively, to actually lose consciousness once the drowning process occurs. Based on the evidence, he opined that Michal was submerged under water for a period in excess of 6 to 8 minutes and for part of that period was conscious and aware of being underwater and unable to breath. Dr. Warner testified, based on his training and experience, that Michal experienced suffering, panic, fear of his impending death, and suffered, as a result of being submerged, an anoxic/hypoxic brain injury and cardiac arrest.

¶ 40    Justice's expert, Dr. Jason Kane, a pediatric critical care specialist, testified based on his training and experience that he disagreed with Dr. Warner's opinion regarding how long Michal would have remained conscious once he was submerged in the water. Although the trial court precluded Dr. Kane from testifying about any of the scientific literature on which Dr. Warner had relied, Dr. Kane explained to the jury his opinions and reasons for disagreeing with Dr. Warner.

¶ 41    As stated above, the jury trial resulted in a $21.5 million verdict against both defendants with a net judgment against Justice for $18.5 million. Justice filed a posttrial motion seeking a judgment n.o.v., new trial, or remittitur. The court denied the motion and Justice appealed.

¶ 42                                    II. ANALYSIS

¶ 43    This court has taken with the case plaintiff's August 5, 2020 motion to strike Justice's appellant and reply briefs and dismiss its appeal.

¶ 44    Plaintiff moves this court to strike Justice's appellant brief for deliberate violations of Illinois Supreme Court Rule 341(a) (eff. May 25, 2018), by using a condensed type of font—*i.e.*, 12-point Garamond—and smaller page margins than the requisite minimums of 1 1/2 inch on the left side and 1 inch on the other three sides. Plaintiff alleges that these violations constitute an attempt by Justice to make an end run around Supreme Court Rule 341(b) (eff. May 25, 2018), which requires a party, not less than 10 days before the brief is due, to move this court for permission to submit a brief in excess of the mandated 50-page limit. Plaintiff asserts that the version of the Garamond font included in popular word processing programs is not a true 12-point font, but actually a condensed font that results in more words per page than a true 12-point font like Times New Roman. Plaintiff also moves this court to declare the Garamond font to be a condensed type prohibited by Rule 341(a); to strike Justice's reply brief for using this same 12-point Garamond font and two lengthy footnotes for substantive arguments to avoid Rule

341(b)'s 20-page limit; and to dismiss Justice's appeal with prejudice or award other appropriate relief.

¶ 45    To support these claims, plaintiff submitted exhibits that showed Justice's use of the 12-point Garamond font and improper small margins enabled Justice to file a 50-page appellant brief that would have been 58 pages if Justice had used 12-point Times New Roman font and the requisite margins. Regarding Justice's reply brief, plaintiff argues that Justice would have exceeded the 20-page limit if Justice had used 12-point Times New Roman font and made all of its substantive arguments in the body of the document instead of using 18 single-spaced lines in the footnotes.

¶ 46    Furthermore, plaintiff explains that there was no undue delay in presenting this motion because counsel began its investigation in March of 2020 and this work required the use of computer and printing equipment in counsel's office, which was not available when the office was closed by gubernatorial order and did not reopen until changes were made to the premises to ensure the safety of office workers and visitors. Plaintiff argues that counsel labored diligently to conduct a complete investigation before counsel could responsibly file this motion.

¶ 47    Plaintiff argues that Justice deliberately and covertly manipulated the text of its appellant brief to obtain the advantage of writing an additional 8 pages of argument without a just order of this court. Plaintiff contends these manipulations prejudiced him by denying him an orderly proceeding according to this court's rules and the fair opportunity to be heard, which "is deeply imbedded in our concept of fair play and justice." See *Peterson v. Raudhava*, 313 Ill. App. 3d 1, 11-12 (2000). Plaintiff contends that if he had been allowed 58 pages for his appellee brief, he would have filed a very different brief with additional arguments presented in a different manner.

¶ 48   In response, Justice acknowledges that Garamond is a slightly smaller font than Times New Roman but asserts that Garamond is widely used in court filings and no reported decision has held that its use violated Rule 341(a). Justice also asserts that if the text of its appellant brief is converted from 12-point Garamond to 12-point Times New Roman, the resulting document would be only 51.5 pages. Further, Justice contends that the erroneous left margins of its appellant and reply briefs were an oversight, but if the correct left margins are used in the appellant brief, the resulting document would be only 52 pages. Justice also contends that its use of a total of three footnotes in its reply brief was not excessive and did not shorten that document in any significant way. Justice states that it did not condense or doctor its appellant and reply briefs and argues that plaintiff should have raised these objections after Justice had filed the appellant brief in September 2019, when it easily could have been corrected, instead of raising these objections more than 10 months later.

¶ 49   We find that plaintiff's arguments are well-supported by the documents. We decline, however, to declare that the use of 12-point Garamond font violates Rule 341(a); this issue may be better addressed by a clarification or revision to Rule 341(a). Although the use of fonts and page margins that are smaller than the requisite minimum might appear to be minor deficiencies, these oversights or intentional violations can result in an unfair advantage by enabling a party to make an end run around our authority and requirements and thereby file briefs that exceed our mandated page limits without timely seeking our permission and giving the opposing party appropriate notice. The Illinois Supreme Court Rules are mandatory, not optional. See *Miller v. Lawrence*, 2016 IL App (1st) 142051, ¶ 18. While we do not condone these practices and caution all parties to refrain from such noncompliance, we will proceed to consider the merits of Justice's appeal. See *Denton v. Universal Am-Can, Ltd.*, 2019 IL App (1st) 181525, ¶¶ 23-25.

¶ 50                    A. Motion for Judgment N.O.V.

¶ 51    Justice argues that its motion for a judgment n.o.v. should have been granted because its conduct was not willful and wanton as a matter of law where the undisputed evidence showed that Justice took numerous precautions to avoid the risk of injury. Specifically, Justice states that it brought its campers to a pool with three certified lifeguards on duty, administered a swim test to every camper, brought flotation devices to the pool, and required non-swimmers to use flotation devises while in the pool and remain in the shallow end of the pool. Justice also prepared its counselors prior to the start of camp with an employee manual, orientation, and training in CPR, first aid and the use of an AED. Moreover, Justice gave the campers' families weekly notices, informing them when the campers would be visiting the pool and to bring floaties or a life jacket from home if needed.

¶ 52    In addition, on the date in question, Justice's staff put flotation devices on Michal, reprimanded him and gave him timeouts when they noticed he was not wearing his flotation devices, and put the flotation devices on him again. Justice argues that its numerous precautions demonstrated a conscious regard for its campers' safety and plaintiff cannot establish willful and wanton conduct by asserting in hindsight that Justice could have done more to minimize or avoid the risk of injury. According to Justice, any attention lapses by its employees in supervising Michal, failing to ensure he kept his water wings on at all times, and failing to do a headcount before leaving the pool deck, while arguably negligent, does not rise to the level of willful and wanton conduct as a matter of law.

¶ 53    We review *de novo* a trial court's denial of a motion for a judgment n.o.v. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 650 (2010); see also *U.S. Steel Corp. v. Illinois Pollution Control Board*,

384 Ill. App. 3d 457, 462 (2008) (*de novo* review is completely independent of the lower court's judgment). A motion for judgment n.o.v. should be entered only in those cases in which all of the evidence, when viewed in the light most favorable to the opponent so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). If reasonable minds might differ as to inferences or conclusions to be drawn from the facts, judgment n.o.v. is not appropriate. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 796 (1999). The court should not grant a judgment n.o.v. if the evidence demonstrates a substantial factual dispute or if an assessment of the witnesses' credibility or conflicting evidence would be dispositive. *Serrano v. Rotman*, 406 Ill. App. 3d 900, 910 (2011).

¶ 54    The Local Governmental and Governmental Employees Tort Immunity Act (Act) protects local public entities and public employees from liability arising from the operation of government. 745 ILCS 10/1-101 *et seq.* (West 2014). The purpose of the Act is to prevent the dissipation of public funds on damage awards in tort cases. *Murry v. Chicago Youth Center*, 224 Ill. 2d 213, 229 (2007). Unless a delineated immunity provision of the Act applies, local public entities and public employees are liable in tort to the same extent as private parties. *Id.*

¶ 55    Section 3-108 of the Act provides that a local public entity or employee who undertakes to supervise an activity is not liable for an injury unless that public entity or employee is guilty of willful and wanton conduct in its supervision and such proximately causes that injury. 745 ILCS 10/3-108(a) (West 2014). The Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or a conscious disregard for the safety of others." 745 ILCS 10/1-210 (West 2014). Generally, the issue of willful and wanton conduct is a question of fact for the jury, but a motion

for judgment n.o.v. may be granted if all the evidence, when viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Barr v. Cunningham*, 2017 IL 120751, ¶ 15; *Pedrick*, 37 Ill. 2d 494 at 229.

¶ 56    "Illinois courts define willful and wanton conduct, in part, as the failure to take reasonable precautions after 'knowledge of impending danger.' " *Barr*, 2017 IL 120751, ¶ 20. Willful and wanton conduct differs from mere negligence in that the former " 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.' " *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 148 Ill. 2d 429, 449 (1992) (quoting Restatement (Second) of Torts § 500 cmt. g, at 590 (1965)). To be willful and wanton misconduct, the actor " 'must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent.' " *Id*. The difference between willful and wanton conduct " 'and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.' " *Id*. This court considers "the totality of the evidence in determining whether a defendant's conduct was willful and wanton." *Barr*, 2017 IL 120751, ¶ 15. "If there is insufficient evidence to sustain an allegation of willful and wanton conduct, the issue should not go to the jury for its consideration." *Id.*

¶ 57    The evidence introduced at trial showed that swimming pools are inherently dangerous for young children due to their risk of drowning and Justice assumed the duty of accompanying and supervising its campers at Bridgeview's pool. The depth of the pool in the shallow area was 3 feet and 6 inches at one end and sloped down to 5 feet at the other end. Although Justice was aware of

the extreme risk of drowning for young campers like Michal, who could not swim or stand anywhere in the pool's shallow area with their mouths or noses above the water level, Justice still allowed about 8 to 10 of its non-swimming campers into the pool, 4 of whom were from the very young 5-7-year-old group to which Michal belonged, without requiring them to wear an authentic lifejacket and be accompanied in the water at all times by an adult. Justice's employees also knew on the date in question that Michal had disobeyed several times their instructions to wear his floaties or water wings when he went in the pool and had been able, more than once, to remove those floatation devices undetected by Justice's employees and go in the water. Although Justice provided flotation devices for its non-swimming campers, testimony showed that counselors still needed to be within an arms-length distance of its young non-swimming campers because those flotation devices were not a sufficient or reliable protection against the risk of children going underwater and drowning. Furthermore, Justice did not use a method or device like wristbands to visually distinguish its non-swimming campers from those who could swim, and Justice did not inform Bridgeview's lifeguards about which campers were non-swimmers. In addition, after Justice told its 5-7-year-old group to exit the pool in preparation to leave, Justice did not perform a headcount to ensure that all of the group's 27 members were present before the group's counselors escorted them from the pool deck and into the locker rooms.

¶ 58    Viewing the totality of the evidence of Justice's conduct in the light most favorable to plaintiff, the evidence did not so overwhelmingly favor Justice that no contrary verdict based on that evidence could ever stand. Justice made a conscious choice to allow its very young, non-swimming campers to enter the public pool during a group swim. Even though the three counselors assigned to supervise Michal's group knew that he could not swim, the group's other members

were scattered throughout the shallow and deep areas of the pool and intermingled with other swimmers of various ages and swimming abilities. In addition to Justice's 73 campers, Bridgeview's day damp and members of the public were also using the pool on the date in question. The large number of children in the pool made group swims far more hazardous than situations when only the general public used the pool. The evidence also showed that the Justice camp counselors were responsible for the supervision of multiple children with various levels of swimming ability and also had to occasionally leave the pool area to accompany or assist young campers who needed to use the restroom. Under these circumstances, Justice must recognize that a counselor was not always able to stay within an arm's-length distance of young non-swimmers like Michal and, thus, Justice's conduct of allowing campers like Michal inside the fenced pool area involved a substantially greater degree of risk than that necessary to make Justice's conduct negligent and the difference of degree was so marked as to amount substantially to a difference in kind.

¶ 59    Justice also contends that section 2-201 of the Act (745 ILCS 10/2-201 (West 2014)), which provides a public employee with immunity against allegations that challenge discretionary policy determinations, is relevant to Justice's claim that it was entitled to a judgment n.o.v. Justice, however, has failed to clearly define this issue, cite pertinent authority and present a cohesive legal argument. See *Williams v. Danley Lumber Co.*, 129 Ill. App. 3d 325 (1984). Consequently, we deem Justice to have forfeited review of the issue involving section 2-201 of the Act. *Id.*

¶ 60    We conclude that the trial court did not err when it denied Justice's motion for a judgment n.o.v.

¶ 61                    B. Trial Court's Evidentiary Rulings

¶ 62      Justice asserts the trial court made numerous evidentiary errors that deprived Justice of a fair trial. Specifically, Justice argues the trial court abused its discretion by making evidentiary rulings that (1) limited the consideration of Justice's conduct as being merely negligent, (2) allowed evidence of Justice's alleged violation of its internal rules as proof of Justice's breach of its legal duty, (3) imposed the statutory duties of a swimming pool operator on Justice, and (4) allowed expert testimony of Michal's conscious pain and suffering despite no factual basis.

¶ 63      The admissibility of evidence is a matter for the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has been clearly abused. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995). A trial court abuses its discretion when its ruling is arbitrary, fanciful or unreasonable, or when no reasonable person would take the same view. *Palacious v. Mlot*, 2013 IL App (1st) 121416, ¶ 18.

¶ 64      First, Justice argues the trial court prevented any factual inquiry into whether Justice's conduct was merely negligent rather than willful and wanton by (1) allowing plaintiff's experts to opine on the ultimate issue of whether Justice's conduct was willful and wanton, (2) preventing Justice from cross-examining an expert on her understanding of that legal standard, and (3) preventing Justice from presenting evidence about the difference in meaning between willful and wanton conduct and negligence.

¶ 65      Specifically, Justice argues the court erred by allowing plaintiffs' experts to repeatedly offer opinions that merely parroted the language set forth in the Act and then compounded that error by precluding Justice's counsel from any meaningful cross-examination of those experts on the meaning of the statutory terms "willful and wanton" or "utter indifference to or conscious

disregard for the safety of others." Justice contends that experts generally are not permitted to testify to the meaning of statutory terms, legal conclusions the jury could make without the expert's testimony, or whether a person acted with a particular state of mind. Justice contends that willful and wanton conduct includes a range of mental states and the issue of whether Justice acted willfully and wantonly was a matter of law for the court to decide and a matter of fact for the jury to decide.

¶ 66    Justice acknowledges that Illinois Rule of Evidence 704 (eff. Jan. 1, 2011) provides that an expert is not prohibited from giving an opinion that embraces an ultimate issue in the case. Justice argues, however, that Rule 704 must be read with Illinois Rule of Evidence 702 (eff. Jan. 1, 2011), which requires the expert to demonstrate sufficient knowledge, skill, experience, training or education that will assist the jury. As a comparison to the instant case, Justice states that an expert in a medical malpractice case may appropriately opine as to the standard of care and a defendant physician's alleged violation of that standard because a jury cannot determine those issues without expert assistance. Here, however, plaintiffs' experts acknowledged they had no expertise regarding or even experience with the statutory terms "willful and wanton," "conscious disregard," or "utter indifference." Justice contends that allowing plaintiffs' experts to repeatedly assert their opinions on these issues improperly usurped and invaded the role of the jury.

¶ 67    Generally, a person will be allowed to testify as an expert when his or her experience and qualifications provide knowledge that is not common to laypersons and when the testimony will aid the trier of fact in reaching its conclusions. *Thompson v. Gordon*, 221 Ill. 2d 414, 428 (2006). An expert only needs to have knowledge and experience beyond that of an average citizen. *Id.* at 429. "A witness, whether expert or lay, may provide an opinion on the ultimate issue in a case."

*Richardson v. Chapman*, 175 Ill. 2d 98, 107–08 (1997). "The trier of fact is not required to accept the expert's conclusion, and therefore such testimony cannot be said to usurp the province of the jury." *Id*. "The test for whether to admit an expert's opinion on the ultimate issue is whether that opinion aids the trier of fact to understand the evidence or determine a fact in issue." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 58 (court found no error in an expert's testimony that a cab company's hiring of a driver with a poor driving record was willful and wanton). We conclude that the testimony of plaintiff's experts met this standard and the trial court did not abuse its discretion by allowing their testimony into evidence.

¶ 68     Next, Justice argues that the trial court prevented it from fully cross-examining plaintiff's expert Hefter regarding the meaning of the terms in the statutory definition of willful and wanton conduct and the significance of those terms in her area of expertise. We disagree; our review of the record shows that Justice did question Hefter on this issue. Moreover, the trial court properly instructed the jury on the meaning of willful and wanton conduct and plaintiff's burden of proof on this issue.

¶ 69     Next, Justice argues that it should have been allowed to present evidence about the meaning of willful and wanton conduct vis-à-vis negligence, but the trial court's ruling that granted plaintiff's motion *in limine* No. 7 prevented (1) Justice's experts from opining that Justice's conduct was merely negligent, (2) the jury from knowing the necessary "definitions, similarities, differences and relationships between" the types of actions or omissions that would constitute negligent conduct as opposed to willful and wanton conduct, and (3) Justice from presenting to the jury its defense and theory of the case, *i.e.*, the numerous precautions Justice took to protect the campers from injury demonstrated Justice's conscious regard for their safety and negated any

claim of willful and wanton conduct as a matter of fact and/or law, even if those precautions were ultimately insufficient.

¶ 70    Plaintiff's motion *in limine* No. 7 asked the trial court to bar "all mention of negligence through any statement, testimony, questioning, impeachment, cross-examination, argument, direct or indirect, by innuendo or otherwise, at any time during the course of the trial of this action, before any member of the venire, a panel, or the jury." Plaintiff's motion argued that the introduction of any discussion of negligence would mislead the jury, blur the issues, cloud the record regarding the jury's findings, create a danger of undue sympathy for defendants, and deprive plaintiff of a fair trial on the merits. Plaintiff asserted that allowing defendants to introduce and discuss negligence in this case would improperly burden plaintiff with fighting an issue completely irrelevant to plaintiff's cause of action and burden the court with instructing the jury on the differences between negligence and willful and wanton misconduct.

¶ 71    The trial court granted plaintiff's motion *in limine* No. 7, explaining that it carefully weighed the danger of confusing or misleading the jury by presenting them with two theories of liability while only one was at issue in this case.

¶ 72    To support its claim of trial court error, Justice contends that *Barr v. Cunningham*, 2017 IL 120751, ¶ 18, supports Justice's broad contentions that (1) a public entity that exercises some precautions to protect participants from injury, even if those precautions ultimately are insufficient to prevent injury, is not guilty of willful and wanton conduct, and (2) under Illinois law, a municipal defendant's mere negligent conduct is sufficient to establish that its conduct was not willful and wanton.

¶ 73    Justice's attempt to apply its broad interpretation of *Barr* to the instant case is unavailing. In *Barr*, a student suffered an eye injury during a floor hockey game that was supervised by a gym teacher, and the court held that the defendants were entitled to a directed verdict because the totality of the evidence, viewed in the light most favorable to the plaintiff, was insufficient to raise a question of fact on the issue of willful and wanton conduct. *Id.* ¶¶ 17-18. Specifically, the court found that the plaintiff failed to meet his burden to show that the teacher exhibited a conscious disregard for the students' safety based on the teacher's failure to require the students to wear available safety goggles because the evidence showed that the teacher did not believe, based on her experience, that a serious eye injury could occur when she required the students to use safety equipment (plastic hockey sticks and squishy balls) and enforced various rules to ensure safety and prevent injuries. *Id.* ¶ 17. The court stated that the evidence that the teacher instituted several safeguards to prevent injuries showed that, at most, she took insufficient precautions and the fact that she did not take the additional step to require the use of safety goggles did not establish a conscious disregard for her students' safety. *Id.* ¶ 18.

¶ 74    Justice's argument in the instant case relies on the *Barr* court's statement that it had previously ruled in *Lynch v. Board of Education of Collinsville Community Unit District No. 10*, 82 Ill. 2d 415, 430-31 (1980), that teachers who conducted practice sessions before a "powderpuff" football game and warned the girls that football could be rough and advised them to wear mouth guards but did not provide any safety equipment were not guilty of willful and wanton conduct even though the precautions they exercised to protect the students from injury were insufficient. *Id.* We, however, find no support for Justice's attempt to broadly interpret this statement in *Barr* to mean that a public entity that has exercised some precautions to protect participants from injury,

even if those precautions were ultimately insufficient, cannot be liable for willful and wanton conduct. Furthermore, the activity at issue in *Barr* is distinguishable from Justice's inherently dangerous activity in the instant case of allowing a young child, whom Justice knew could not swim, in a swimming pool so deep that the child could not even stand without drowning and then leaving the child unsupervised.

¶ 75    Here, plaintiff did not pursue a negligence claim. Instead, plaintiff's claim argued that defendants' course of conduct exhibited utter indifference or conscious disregard for Michal's safety. The relevant issue for the jury to decide was whether defendants' conduct was willful and wanton by evaluating the evidence according to the relevant law provided by the trial court. Furthermore, the record establishes and Justice concedes that the court allowed it to present testimony, photographs, video and documents to show that its conduct was either reasonable or merely negligent but did not rise to the level of willful and wanton conduct. Considering the danger of misleading or confusing the jury in a matter that involved the tort liability of public entities and alleged only a willful and wanton conduct cause of action against the defendants, we find no abuse of discretion in the trial court's decision that precluded Justice from injecting through experts a discussion of the definitions of and qualitative differences, similarities and relationships between negligence and willful and wanton conduct.

¶ 76    Second, Justice argues that the trial court abused its discretion by allowing plaintiff to present evidence of Justice's alleged violation of its internal rules and policies as evidence of a breach of a legal duty. We find no abuse of discretion by the trial court here. Although a violation of an internal rule or policy does not constitute willful and wanton conduct *per se*, "a jury may

consider it along with other evidence in reaching a determination of willful and wanton conduct. *Hudson v. City of Chicago*, 378 Ill. App. 3d 373, 405-06 (2007).

¶ 77 Third, Justice argues the trial court abused its discretion by allowing evidence that permitted plaintiff to shift onto Justice, a day camp that had no swimming pool, the statutory duty of swimming pool operators like Bridgeview to provide all aspects of pool safety. Specifically, Justice contends that when the court allowed evidence (presumably expert testimony) that Justice should have given its campers flotation devices approved by the Red Cross instead of water wings and Justice's counselors should have been in the water with its campers, the trial court ruled that the provisions of section 820 of Title 77 of the Illinois Administrative Code (77 Ill. Adm. Code § 820 *et seq.*) (eff. Oct. 4, 2013), applied to Justice.

¶ 78 Justice mischaracterizes the trial court's ruling, which did not rule that the statutory duties of pool operators concerning pool safety applied to Justice. Rather, the trial court allowed plaintiff to present evidence to show that Justice acted in utter indifference to and with conscious disregard for Michal's welfare when Justice voluntarily assumed the duty to supervise its campers at the pool and allowed young non-swimmers into the pool with water wings and without the direct supervision of adults who were also in the water. We find no abuse of discretion by the trial court.

¶ 79 Fourth, Justice argues that the trial court abused its discretion when it allowed plaintiff's expert, Dr. Warner, to opine about Michal's conscious pain and suffering in the absence of any competent evidence that Michal actually experienced pain and suffering. Specifically, Justice argues that no witness observed Michal right before or during the drowning process, the act of his drowning was not on the video, and no one could establish if or for how long he was conscious during the drowning process. According to Justice, Dr. Warner's opinion about Michal's alleged

conscious pain and suffering was mere speculation. Justice asserts that the absence of evidence of what actually happened to Michal should have resulted in plaintiff being barred from presenting to the jury a claim for damages under the theory of conscious pain and suffering.

¶ 80    Our review of the record establishes that plaintiff's evidence of Michal's conscious pain and suffering was competent and not speculative. The Survival Act (755 ILCS 5/27-6 (West 2014)), allows for the recovery of damages sustained by the deceased up to the time of death (*Rogers v. Cook County*, 2013 IL App (1st) 123460, ¶ 29), and a jury may find pain and suffering based on the circumstances presented by indirect evidence (*Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 174 (1995)). We find that the trial court did not abuse its discretion by admitting the testimony of Dr. Warner.

¶ 81    Finally, Justice argues that the trial court abused its discretion by denying Justice the opportunity to effectively rebut Dr. Warner's opinion about the assumed length of time Michal endured conscious pain and suffering. Specifically, Justice contends the court barred its counsel from conducting a proper direct examination of its expert, Dr. Kane, which would have explained that Dr. Warner had misinterpreted the scientific articles upon which he based his opinion.

¶ 82    Our review of the record establishes that the trial court permitted Justice, through Dr. Kane, to explain to the jury his opinions and reasons for disagreeing with Dr. Warner. The court, moreover, prevented Dr. Kane from reading portions of medical literature on direct exam to buttress his interpretation—a ruling consistent with Illinois law. The substance of learned treatises are not admissible in Illinois courts as substantive evidence, and expert witnesses cannot read from nor summarize medical literature as a basis for their opinions on direct exam. See *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 54-55 (1984)); see also *Adams v. Family Planning*

*Associates Medical Group, Inc.*, 315 Ill. App. 3d 533, 550 (2000) (an opponent's expert may speak to the methodology that another expert used, but it is the opponent's responsibility during cross-examination to challenge the sufficiency and reliability of the basis for the other expert's opinion). We find no abuse of discretion by the trial court here.

¶ 83                           C. Jury Instructions and Closing Argument

¶ 84    Justice argues the trial court abused its discretion by (1) giving the jury an improper willful and wanton conduct issues instruction, (2) rejecting Justice's three jury instructions and a special interrogatory regarding negligence, (3) preventing Justice's counsel from arguing to the jury the distinction between negligence and willful and wanton misconduct, and (4) striking, after denying Justice's posttrial motion, certain aspects of Justice's offer of proof regarding the expected testimony of Justice's damages expert in opposition to plaintiff's expert.

¶ 85    First, Justice argues the court erred when, over Justice's objection, it instructed the jury as follows:

> "The Plaintiff claims that he was injured and sustained damage, and that on
>
> June 17, 2014, the defendant, JUSTICE PARK DISTRICT, was willful and wanton
>
> in one or more of the following respects:
>
>     1. Did not allow Michal Duda into the wading pool; and/or
>
>     2. Taking Michal Duda to the pool; and/or
>
>     3. Allowing Michal Duda into the pool; and/or
>
>     4. Did not have adequate flotation devices; and/or
>
>     5. Did not mark Michal Duda as a non-swimmer; and/or
>
>     6. Did not supervise Michal Duda; and/or

7. Did not put Michal Duda in an appropriate flotation device; and/or

8. Did not ensure Michal Duda remained in his flotation device while at the pool; and/or

9. Not being in the water with Michal Duda at all times when it knew he could not swim; and/or

10. Did not adequately communicate with Bridgeview Park District prior to coming to the pool; and/or

11. Did not adequately train the camp counseling staff; and/or

12. Did not enforce an adequate head count system; and/or

13 Did not supervise its camp counselors; and/or

14. Did not make all camp counselors aware of non-swimmers.

The Plaintiff further claims that one or more of the foregoing was a proximate cause of the decedent's death.

Justice Park District denies that it was willful and wanton in doing any of the things claimed by the plaintiff, and denies that any claimed act or omission on the part of Justice Park District was a proximate cause of the decedent's death.

Justice Park District further denies that the plaintiff was injured or sustained damage to the extent claimed."

¶ 86 We review for an abuse of discretion a trial court's decision to grant or deny a party's requested instruction (*Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 505 (2002)), and we review *de novo* the issue of whether an instruction correctly states the law (*Studt v. Sherman Health System*, 2011 IL 108102, ¶ 13). The trial court should refuse instructions that misstate the law, are

inapplicable to the case or are otherwise confusing. *Howat v. Donelson*, 305 Ill. App. 3d 183, 187 (1999). "The standard for deciding whether a trial court abused its discretion [in deciding which instructions to give the jury] is whether, taken as a whole, the instructions fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 973-74 (2002).

¶ 87    Justice argues that the trial court should have given the jury the failure to supervise charge only, but instead improperly charged the jury with 13 other alleged acts or failures to act and instructed the jury that a violation of any one of the 14 enumerated items was sufficient by itself to support a finding of willful and wanton conduct. Justice argues, without reference to any relevant law, that this instruction misstated the law and confused the jury. Justice contends that items 4, 7 and 8 were repetitive iterations of Justice's non-existent duty to provide flotation devices; items 4 and 7 were irrelevant because the adequacy of the flotation devise Justice provided to Michal did not cause his drowning; and item 8 imposed an insurer-like duty on Justice despite the undisputed evidence that Michal repeatedly removed the flotation device.

¶ 88    Plaintiff states that Justice forfeited review of this claim because Justice's counsel responded "No," when the trial court asked Justice during argument at the jury instruction conference if Justice objected to this issues instruction. See *Johnston v. Basic*, 16 Ill. App. 3d 453, 457 (1973) (to preserve a jury instruction issue for review, the party must have made a specific objection at the instruction conference). Even if we assumed that Justice has preserved this issue for review, the undisputed evidence showed that Justice accompanied their campers to the pool and thus voluntarily assumed the duty of supervising them. Furthermore, the issue instruction followed the plain language of Illinois Pattern Jury Instructions, Civil, No. 20.01 (hereinafter cited

as IPI Civil, No. 20.01), and the 14 enumerated items were properly presented to and appropriately weighed by the jurors based on the ample evidence for each enumerated item presented at trial by the witnesses. The issue instruction fairly and comprehensively apprised the jury of the relevant legal principles based on the evidence, and we find no abuse of discretion by the trial court.

¶ 89    Second, Justice argues the trial court improperly refused Justice's proffered (1) IPI Civil instructions that defined negligence (IPI Civil, No. 10.01) and ordinary care (IPI Civil, No. 10.02); (2) non-IPI instruction, which stated: "Where a defendant has exercised some precautions to protect participants from injury, even if those precautions were insufficient, that defendant's conduct is not considered willful and wanton."; and (3) special interrogatory No. 1, which stated: "At the time of the occurrence, was the conduct of Justice Park District negligent but not willful and wanton?" Justice claims that its proffered special interrogatory No. 1 was "based on solid authority and would have allowed any general verdict finding of willful and wanton conduct to be properly tested." Justice argues that the three refused jury instructions and the special interrogatory would have allowed the jury to consider the core proposition of Justice's defense, *i.e.*, that Justice's conduct constituted mere negligence as opposed to willful and wanton conduct.

¶ 90    Causes of action for simple negligence and willful and wanton conduct are fundamentally different in kind (see *Burke*, 148 Ill. 2d at 449), as demonstrated by the separate and distinct IPI Civil jury instructions for these two causes of action. The record establishes that the trial court carefully weighed the danger of confusing or misleading the jury by presenting them with these two theories of liability even though willful and wanton conduct was the only theory at issue in this case. The record also shows that Justice was able to present testimony about the precautions it took to ensure the campers' safety and fully argue to the jury that its conduct was not willful and

wanton. Furthermore, a special interrogatory serves as a guardian of a general verdict in a civil jury trial (*O'Connell v. City of Chicago*, 285 Ill. App. 3d 459, 467 (1996)), and is in proper form if it relates to an ultimate issue of fact upon which the rights of the parties depend (*Noel v. Jones*, 177 Ill. App. 3d 773, 783 (1988)). Justice's proposed special interrogatory was not in proper form because the ultimate and controlling legal issue here concerned willful and wanton conduct, not negligence. Justice's proposed special interrogatory could have confused and misled the jury. We find no abuse of discretion in the trial court's decision to reject Justice's jury instructions and special interrogatory regarding negligence.

¶ 91    Third, Justice argues the trial court abused its discretion by precluding Justice from effectively arguing to the jury that Justice's conduct was at most negligent rather than willful and wanton. Specifically, Justice argues the court improperly prevented Justice from using during closing argument 4 out of 72 PowerPoint slides that contained dictionary and thesaurus definitions of the words "willful" and "wanton." Justice asserts that it did not intend to argue that the text on the four barred slides constituted expressions of Illinois law in contravention to the applicable law, about which the court would later instruct the jury. According to Justice, the four rejected PowerPoint slides were perfectly legitimate expressions of Justice's perspective on the law and facts of this case.

¶ 92    The purpose of closing argument is to assist the jury in fairly arriving at a verdict based on the law and the evidence. *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 948 (2000). The wide latitude generally permitted to parties in closing argument is not without limit. *Id.* at 947. The record establishes that the trial court limited the use of other definitions that were not consistent with the definitions contained in the IPI Civil jury instructions. Accordingly, we find

no abuse of discretion when the trial court prevented Justice from using four slides that contained language that was inconsistent with the law.

¶ 93    Finally, Justice argues the trial court abused its discretion when the court, after denying Justice's posttrial motion, struck certain aspects of Justice's lengthy and detailed offer of proof, which Justice submitted after the trial and concerned Dr. Kane's expected testimony in opposition to Dr. Warner's testimony. According to Justice, the offer of proof set forth Dr. Kane's criticisms of Dr. Warner's methodology and the bases of his opinion.

¶ 94    "The two primary functions of an offer of proof are (1) to disclose to the trial judge and opposing counsel the nature of the offered evidence, enabling them to take appropriate action, and (2) to provide the reviewing court with a record to determine whether exclusion of the evidence was erroneous and harmful." *People v. Thompkins*, 181 Ill. 2d 1, 9 (1998). "Trial courts are required to permit counsel to make offers of proof, and a refusal to permit an offer generally is error." *Id*. However, "an offer of proof is not required where it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced." *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002).

¶ 95    The trial court, in its May 13, 2019 order denying Justice's posttrial motion, struck Justice's offer of proof for Dr. Kane. The court ruled that Justice forfeited its opportunity to make a timely offer of proof regarding Dr. Kane's opinions on medical literature because Justice failed to make the offer of proof before and after Dr. Kane's trial testimony and then Justice tendered the offer of proof on this issue two months after the verdict was rendered.

¶ 96    Even if we assumed that Justice preserved this issue for review, the trial court allowed Dr. Kane to testify on direct that he disagreed with Dr. Warner's opinion and the basis for his

opinion. Specifically, Dr. Kane was allowed to testify, based on his training and experience on the topic, that he disagreed with Dr. Warner's opinion regarding how long Michal would have remained conscious once he was submerged in the water. As discussed above, we have concluded that the trial court properly prevented Dr. Kane from reading or summarizing on direct examination medical treatises and literature, which are not admissible as substantive evidence; although experts may always state the basis for their opinion, the admission of authoritative treatises is only for the purpose of impeaching that expert. See *Mielke*, 124 Ill. App. 3d at 54-55. All the properly admitted testimony of Dr. Kane went to the jury to consider in reaching its verdict, and we find no abuse of discretion by the trial court.

¶ 97                                    D. Verdict Amount

¶ 98    Finally, Justice argues that the amount of the verdict awarded to plaintiff is excessive and requires a remittitur or a new trial.

¶ 99    The jury awarded plaintiff a total of $21.5 million in damages, which was divided among the following five elements: $6 million for past grief, sorrow and mental suffering; $5 million for future grief, sorrow and mental suffering; $5 million for past loss of society; $4 million for future loss of society; and $1.5 million for the pain and suffering Michal experienced.

¶ 100   Justice argues that the $21.5 million award demonstrated that the jury, feeling understandable sympathy for Michal's family, returned a verdict that far exceeds the range of fair and reasonable compensation, should shock the judicial conscience, and may have resulted from the jury's passion and prejudice against the defendants. Justice contends that the excessive award is also a product of (1) plaintiff counsel's repeated and improper questions to potential jurors about their willingness to award multi-million dollar damages, which resulted in the trial court excusing

for cause prospective jurors who expressed any hesitancy to award plaintiff a multi-million dollar verdict against a public entity defendant; and (2) plaintiff's closing argument, which improperly told the jury that plaintiff's suggested total award for up to $31 million was based on counsel's research and prior case experience. According to Justice, its empirical research indicated that the value of this case was between $2 million and $4 million, and the verdict here was more than three times the norm for a child wrongful death case.

¶ 101    In response, plaintiff argues that the jury heard evidence about the loss suffered by Michal's two young parents and two sisters. One of Michal's sisters was his twin, and she was present at the time of Michal's drowning. In the trial court, plaintiff responded to Justice's assertion that the verdict was excessive with the following wrongful death verdicts: $48 million verdict in case No. 14 L 7337, which involved an 8-year-old child; $45 million in case No. 12 L 8432, which involved a 2-year-old child; and $18.35 million in case No. 13 L 6693, which involved an infant.

¶ 102    The amount of a verdict is generally at the discretion of the jury. *Dahan v. UHS of Bethesda, Inc.*, 295 Ill. App. 3d 770 (1998). A damage award is not subject to scientific computation. *Schaffner v. Chicago & North Western Transportation Co.*, 161 Ill. App. 3d 742, 759 (1987). A question of damages is to be determined by the trier of fact, and "a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 112-114 (1997); *Epping v. Commonwealth Edison Co.*, 315 Ill. App. 3d 1069 (2000). However, a court will order a remittitur, or, if the plaintiff does not consent, a new trial, if a verdict is excessive. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412-13 (1997). An award may be viewed as excessive if it (1) exceeds the range of fair and reasonable compensation, (2) is the result of passion or prejudice, or (3) is so large that it shocks the judicial conscience.

*Richardson*, 175 Ill. 2d at 113. But remittitur will not be ordered when an award " 'falls within the flexible range of conclusions which can reasonably be supported by the facts.' " *Best*, 179 Ill. 2d at 412, quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470 (1992). When determining whether a particular award is excessive, Illinois courts have traditionally declined to make comparisons with the amounts of damages awarded in other cases. *Richardson*, 175 Ill. 2d at 114.

¶ 103    Here, it was the jury's function to consider the credibility of the witnesses and determine an appropriate amount of damages. We cannot say that the present award to the Estate of Michal Duda was the result of prejudice or passion, shocks the conscience, or lacks support in the evidence. The record shows that Michal's family suffered a devastating loss in a very tragic manner. Furthermore, plaintiff's counsel did not improperly question potential jurors to indoctrinate them or remove anyone whom counsel suspected would not render a generous award to plaintiff; rather, counsel sought to uncover whether any potential jurors harbored a latent prejudice against large verdicts or could award money damages if the law and evidence supported such a verdict. See *DeYoung v. Alpha Construction Co*, 186 Ill. App. 3d 758, 764-65 (1989). Finally, Justice forfeited on appeal its argument challenging plaintiff's reference to sympathy during closing argument because Justice failed to make a timely objection. *York v. El-Ganzouri*, 353 Ill. App. 3d 1, 6 (2004).

¶ 104    Accordingly, we reject Justice's argument that the amount of the verdict awarded to plaintiff was excessive and requires a remittitur or a new trial.

¶ 105                                III. CONCLUSION

¶ 106    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 107    Affirmed.